AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>2101 Southwest Sunset Boulevard, Building A,<br>Apartment 308, Renton, Washington, as fully described<br>in Attachment A | )<br>)<br>)   Case No.   MJ18-101<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Seventeen (17) locations and eight (8) vehicles, as fully described in Attachment A-1

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B for a list of items to be seized.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution and possession with intent to distribute controlled substances; and |
| 21 U.S.C. § 846 | conspiracy to distribute controlled substances |

The application is based on these facts:

See Affidavit of Task Force Officer Richard Huntington

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Richard Huntington
*Printed name and title*

Sworn to before me pursuant to CrimRule 4.1.

Date:  _____03/12/2018_____

_____
*Judge's signature*

City and state:  Seattle, Washington

United States Magistrate Judge Brian A. Tsuchida
*Printed name and title*

1

**AFFIDAVIT**

2

County of King            )

3                                        )

State of Washington    )

4

5    Richard Huntington, being first duly sworn on oath, deposes and says:

6                    **INTRODUCTION AND AGENT BACKGROUND**

7         1.      I am a Task Force Officer (TFO) with the Drug Enforcement

8    Administration (DEA), and have been so deputized since May 2008.  I am currently

9    employed as a Police Officer with the City of Seattle and have been so employed since

10   August of 1997.  In my capacity as a Task Force Officer, I conduct investigations of the

11   Controlled Substance Act, that is, Title 21, United States Code, Sections 841 and 846, et

12   seq., and related offenses.  I have personally participated in hundreds of investigations,

13   arrests, and seizures relating to the manufacture, distribution, and transportation of

14   controlled substances, and offenses related to controlled substances violations such as

15   money laundering.  This includes investigations involving the use of informants, the use

16   of undercover agents, the execution of search warrants, and Title III investigations.

17        2.      I have encountered and have become familiar with various tools, methods,

18   trends, paraphernalia and related articles utilized by various traffickers in their efforts to

19   import, export, conceal and distribute controlled substances.  I am also familiar with the

20   manner in which drug traffickers use telephones, often cellular telephones, to conduct

21   their unlawful operations, and how they code their conversations to disguise their

22   unlawful activities.

23        3.      I have participated in the debriefing of defendants, witnesses, and

24   informants, during which time I have discussed with them their methods of drug

25   smuggling, distribution, packaging, trafficking, avoiding law enforcement, and

26   laundering proceeds, among other concerns related to drug trafficking.  I have discussed

27   and learned from other law enforcement investigators in regards to these matters as well.

28

AFFIDAVIT OF RICHARD HUNTINGTON- 1

1    4.    In addition to practical experience, I have received formal training in
2 controlled substances enforcement.  This includes training regarding controlled
3 substance recognition, field testing, undercover investigations, telecommunications
4 analysis, surveillance techniques, financial investigations, and clandestine laboratories.

5                   **PURPOSE OF THE AFFIDAVIT**

6    5.    This affidavit is submitted for the limited purpose of establishing probable
7 cause to search **2101 Southwest Sunset Boulevard, Building A, Apartment 308,**
8 **Renton, Washington.**

9    6.    The facts in this affidavit come from my personal observations, my training
10 and experience, and information obtained from other agents and witnesses.  I have not
11 included every fact concerning this investigation.  Rather, I have set forth the facts that I
12 believe are necessary for a fair determination of probable cause.

13               **SUMMARY OF PROBABLE CAUSE**
14       **Authorization of Wire and Electronic Communications**

15    7.    On September 6, 2017, the Honorable James L. Robart, United States
16 District Judge for the Western District of Washington, signed an Order authorizing
17 interception of wire and electronic communications of (206) 890-5711 ("TT1") used by
18 Michael Morgan and (206) 474-8971 ("TT4") used by Joseph Wilson.  In doing so,
19 Judge Robart found probable cause to believe that TT1 and TT4 were being used to
20 further drug trafficking and related offenses.  Interception pursuant to that order
21 strengthened investigators' beliefs that Morgan, Wilson, and their associates are
22 distributing narcotics in the Western Washington area. Interception ceased on or about
23 October 5, 2017.

24    8.    On November 3, 2017, the Honorable James L. Robart, United States
25 District Judge for the Western District of Washington, signed an Order authorizing
26 interception of wire and electronic communications for (206) 557-2885 ("TT12") used
27 by Crystal Barquet, (253) 224-9829 ("TT15") used by Charles Cheatham, (850) 361-
28 7470 ("TT17") used by Danavian Hunter, (206) 330-4359 ("TT18") used by Edward

AFFIDAVIT OF RICHARD HUNTINGTON- 2

1  Locke, (206) 972-8851 ("TT19") used by Anthony Dao, and (253) 254-2227 ("TT21")
2  used by Calvin Thomas.  Interception of TT12 and TT19 ceased on November 16, 2017.
3  Interception of TT15 and TT18 ceased on December 2, 2017. Interception of TT21
4  ceased on December 3, 2017. Interception of TT17 ceased on December 6, 2017.
5      9.     On February 12, 2018, the Honorable James L. Robart, United States
6  District Judge for the Western District of Washington, signed an Order authorizing
7  interception of wire and electronic communications for (206) 501-5395 ("TT3") used by
8  Johnny Davis, (850) 361-7470 ("TT17") used by Danavian Hunter, (206) 618-7657
9  ("TT40") used by Michael Morgan, (425) 529-7868 ("TT6") used by Railen Wheeler,
10 (206) 619-2805 ("TT41") used by Railen Wheeler, (323) 408-4784 ("TT24") used by
11 Michael Davis, and (213) 833-8533 ("TT46") used by Charles Cheatham. In doing so,
12 Judge Robart found probable cause to believe that the listed target telephones were being
13 used to further drug trafficking and related offenses. Interception pursuant to that order
14 began on February 13, 2018 and is ongoing, and has strengthened investigators' beliefs
15 that the users of those phones, and their associates, are distributing narcotics in the
16 Western Washington area.
17     10.     In this Affidavit, I discuss telephone calls and text messages that were
18 intercepted pursuant to the Orders identified above. I know through training and
19 experience, including experience with this investigation, that individuals involved in the
20 distribution of controlled substances and other criminal activity often use coded words
21 and inferences when referring to their illegal activity. I have used this training and
22 experience, as well as the training and experience of other law enforcement officers
23 familiar with this investigation, to substitute what I believe to be an accurate translation
24 for these coded words and inferences which are included in parentheses in this affidavit.
25 The following summaries are based on my review of intercepted communications, and
26 from my discussions with other law enforcement officers familiar with this investigation
27 who have reviewed the intercepted communications. The paragraphs herein include the
28

AFFIDAVIT OF RICHARD HUNTINGTON- 3

1  summaries of pertinent portions of intercepted calls, and are not necessarily the entire

2  conversations between the parties involved.

3  <center>**Intercepted Calls with TT61**</center>

4      11.    On February 20, 2018, TT40 placed an outgoing call (Session 334) to an

5  unknown male (GIPSON) using **TT61** (206-639-3018). During the call, Morgan and

6  Jevon Gipson (identification discussed below) had the following exchange:

7      GIPSON:    Bam, bam, what's up with it?

8      MORGAN:   How about you [UI]

9      GIPSON:    Uh, shit I was just checking on you bro man, need you to slide

10                    through man [U/I] holla at ya.

11     MORGAN:   Your crib?

12     GIPSON:    Uh.  Shit not right now I just took off man.  Uh.  But I will be in

13                    about… huh?

14     MORGAN:   Go ahead.

15     GIPSON:    What you say a little bit later on tonight or something?

16     MORGAN:   Yeah that's cool.

17     GIPSON:    Uh, yeah I just need you to slide through man.

18     MORGAN:   I got you!

19     GIPSON:    Holla at you one time real quick. Yeah?

20     MORGAN:   Yeah. Alright.

21     12.    Later on that same day, Gipson placed an incoming call using **TT61** to

22  TT40 (Session 337). During the call, Morgan and Gipson had the following exchange:

23     MORGAN:   Hello?

24     GIPSON:    What's up bug?  Back out my way?

25     MORGAN:   Uh, no I'll be back up that way in a little bit.  I'll call you [voices

26                    overlap]

27     GIPSON:    Uh [UI].

28     MORGAN:   As soon as I leave.

AFFIDAVIT OF RICHARD HUNTINGTON- 4

| | | |
|---|---|---|
| 1 | GIPSON: | If not, don't trip bro it ain't no bother, you know what I'm saying I |
| 2 | | just want to let you know. You know because [UI] man. It ain't no. |
| 3 | MORGAN: | I'm gonna come tonight. As soon as my girl get in. |
| 4 | GIPSON: | Okay.  Okay for sure. |

13.    Based upon my training and experience, and within context of other conversations intercepted during the course of this investigation, I believe Gipson purchases narcotics from Morgan.  Based upon my experience in this investigation, I am aware of the fact that Morgan is extremely conscientious in what he says over the phone. Most individuals who speak with Morgan over the phone share the same level of vigilance in their choice of words when discussing drug trafficking habits. When Gipson states in part, "…need you to slide through man [U/I] holla at ya." I believe Gipson is referring to the fact that he wants to conduct business face to face with Morgan and purchase an unknown controlled substance from Morgan. Gipson goes so far as to re-iterate the statement near the end of the conversation by stating again that he was going to "Holla at you one time real quick." As several hours pass, Gipson called Morgan to check on his whereabouts. Once Morgan advises Gipson that he would be on the way in a little while, Gipson appears to downplay the necessity for seeing Morgan by stating "don't trip bro it aint no bother…" I am aware that some customers of DTOs do not want to push the limits of their connections to their drug supply and will "play it cool" when speaking with their source. In this instance, I believe Morgan is the source of supply for Gipson and he assures Gipson that he will be coming by Gipson later that evening.

### Physical Surveillance of TT61

14.    Investigators obtained a tracking warrant for TT61.  On March 12, 2018, investigators conducted physical surveillance in conjunction with GPS data for TT61. At approximately 6:21 p.m., investigators went to an apartment complex at 15110 Macadam Road South in Tukwila, Washington.  GPS data for TT61 indicated that the

AFFIDAVIT OF RICHARD HUNTINGTON- 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   phone was in this vicinity.  Investigators observed Jevon Gipson, identification

2   discussed below, get into a white Kia Rio hatchback and depart.

3         15.   Investigators conducting surveillance at **2101 Southwest Sunset**

4   **Boulevard** in Renton, Washington observed the white Kia Rio hatchback arrive at this

5   apartment complex and park.  Investigators observed Gipson sit in the vehicle for a

6   couple of minutes.  Gipson got out and opened the hatchback of the vehicle.  Gipson

7   went to the trunk, looked both ways and behind himself.  Investigators identified Gipson

8   from his Washington driver license photograph.  Gipson then began digging in the trunk.

9   He pulled a large black and flat object from the trunk area.  Investigators believe that

10  this was the floorboard that may have covered the spare tire in the vehicle.  As he did

11  this, investigators observed Gipson looking over his shoulder and looking around.  At

12  one point, investigators saw Gipson remove a package wrapped in brown packaging

13  material consistent with the size of a kilogram of cocaine or other drug from the rear of

14  the vehicle.  Investigators observed Gipson put the object into a black, possibly plastic,

15  bag.  Gipson readjusted the suspect floor cover, draped a coat over his arm and the black

16  plastic bag, closed the hatchback and walked to **Building A**.

17        16.   Investigators observed Gipson appear to use a key code or prox card to

18  access the common access lockout door to **Building A**.  Investigators observed Gipson

19  walk to the third level and enter **Apartment 308** using a key.

20        17.   At approximately 7:00 p.m., investigators observe Gipson exit the

21  apartment, walk to the Kia Rio hatchback, and depart.  Investigators followed Gipson

22  away until a uniformed Seattle Police Officer was able to stop the Kia Rio hatchback.

23  The officer had Gipson step out of the vehicle.  As Gipson stepped out of the vehicle, the

24  officer could see, what was appeared to be, based upon his training and experience, a

25  one ounce package of cocaine or methamphetamine in the driver's door storage

26  compartment.  The officer proceeded to frisk Gipson, finding a hard object in his front

27  right pants pocket.  The officer removed the item, finding another ounce of narcotics.  A

28  narcotics detective at the stop identified the substance as cocaine based upon his training

AFFIDAVIT OF RICHARD HUNTINGTON- 6

1   and experience.  Investigators searched the vehicle for additional evidence,

2   approximately one kilogram of cocaine in the vehicle (field test positive).

3                    **Request for Delay of Notice and Night Time Service**

4        18.    I am requesting a delay of notice for this search warrant.  The facts for this

5   affidavit are from a wiretap investigation that will be ongoing for at least three months.

6   I believe that premature disclosure of the facts in this investigation could jeopardize the

7   investigation, including creating a risk to the safety of informants, causing flight from

8   prosecution or destruction of evidence, and seriously jeopardizing the investigation by

9   giving the person notified an opportunity to destroy evidence, change patterns of

10  behavior, advise confederates, and flee from prosecution.  Additionally, investigators

11  have stationed themselves outside the door of the apartment, preventing other from

12  entering and destroying evidence.  Since the time of the stop, a female claiming to live at

13  the apartment attempted to go inside.  Investigators stopped her from doing so.  She was

14  uncooperative with investigators and has since left.  Investigators would like to search

15  the apartment before anyone else attempts to access the apartment.

16                 **KNOWLEDGE BASED ON TRAINING AND EXPERIENCE**

17       19.    Based upon my training and experience, and my discussions with other

18  experienced officers and agents involved in drug investigations, I know the following:

19            a.    Traffickers of controlled substances, and those who assist them,

20  maintain and tend to retain accounts or records of their drug trafficking activities,

21  including lists of drug quantities and money owed, telephone records including contact

22  names and numbers, photographs, and similar records of evidentiary value.  These items

23  are generally kept in locations where drug traffickers believe their property is secure and

24  will remain undetected from law enforcement, such as inside their homes, vehicles,

25  storage lockers, and businesses.

26            b.    Traffickers of controlled substances commonly maintain records

27  reflecting names or nicknames, addresses, and/or telephone numbers of their suppliers,

28  customers and associates in the trafficking organization.  Traffickers commonly maintain

AFFIDAVIT OF RICHARD HUNTINGTON- 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  this information in books or papers as well as in their cellular telephones.  Traffickers
2  often maintain cellular telephones for ready access to their clientele and to maintain their
3  ongoing drug trafficking.  Traffickers often change their cellular telephone numbers to
4  avoid detection by law enforcement, and it is common for traffickers to use more than
5  one cellular telephone at any one time.

6          c.      Traffickers maintain evidence of their criminal activity at locations
7  that are convenient to them, including their residences, vehicles, and storage lockers.
8  This evidence often includes not only contraband and paraphernalia, but also financial
9  records, records of property and vehicle ownership, records of property rented, and other
10 documentary evidence relating to their crimes.  Drug traffickers sometimes take or cause
11 to be taken photographs and/or video recordings of themselves, their associates, their
12 property, and their illegal product.  These individuals often maintain these photographs
13 and recordings in their possession or at their premises.

14         d.      During the execution of search warrants, it is common to find
15 papers, letters, billings, documents, and other writings which show ownership, dominion,
16 and control of vehicles, residences, and/or storage units.

17         e.      Persons trafficking and using controlled substances commonly sell
18 or use more than one type of controlled substance at any one time.

19         f.      Traffickers frequently maintain items necessary for weighing,
20 packaging and cutting drugs for distribution.  This paraphernalia often includes, but is not
21 limited to, scales, plastic bags and cutting/diluting agents and items to mask the odor of
22 drugs.

23         g.      It is common for drug dealers to also be users of their product, and
24 that it is common for the drug user to maintain paraphernalia associated with the use of
25 controlled substances.

26         h.      Traffickers frequently maintain records, books, notes, ledgers, travel
27 documents, and other papers relating to the transportation and distribution of controlled

28

AFFIDAVIT OF RICHARD HUNTINGTON- 8

1  substances, including travel records, in locations convenient to them, such as their
2  residences and vehicles.

3          i.      Traffickers frequently keep on hand amounts of United States
4  currency in order to maintain and finance their ongoing narcotics business.  They
5  commonly deal in currency because of its untraceable nature.  They sometimes convert
6  their illicit currency into currency equivalents such as cashier's checks and money orders.
7  Traffickers often conceal in secure locations such as their residences and vehicles
8  currency, financial instruments, precious metals, jewelry, and other items of value which
9  are the proceeds of drug transactions and evidence of consequential financial
10  transactions, relating to obtaining, transferring, secreting, or spending large sums of
11  money made from engaging in drug trafficking activities, and financial books, records,
12  receipts, notes, ledgers, diaries, journals, and all records relating to income, profit,
13  expenditures, or losses, and other records showing the management of such assets.
14  Traffickers often have money counters.

15          j.      Traffickers often maintain weapons, including guns, ammunition,
16  and body armor, in secure locations such as their residences and vehicles, in order to
17  protect their drugs and drug proceeds.

18          k.      Traffickers often have false identification documents and
19  identification documents in the names of others in order to conceal their identities.

20          l.      Traffickers very often place assets in names other than their own, or
21  use fictitious names and identification, to avoid detection of these assets by government
22  agencies, and that even though these assets are in other persons names, the drug dealers
23  actually own and continue to use these assets and exercise dominion and control over
24  them.

25          m.      Illegal drug trafficking is a continuing activity over months and even
26  years.  Illegal drug traffickers will repeatedly obtain and distribute controlled substances
27  on a somewhat regular basis, much as any distributor of a legitimate commodity would
28  purchase stock for sale and, similarly, such drug traffickers will have an "inventory"

AFFIDAVIT OF RICHARD HUNTINGTON- 9

1 | which will fluctuate in size depending upon various factors to include the demand and
2 | supply for the product. I would expect the trafficker to keep records of his illegal
3 | activities for a period of time extending beyond the time during which he actually
4 | possesses illegal controlled substances, in order that he can maintain contact with his
5 | criminal associates for future drug transactions, and so that he can have records of prior
6 | transactions for which, for example, he might still be owed money, or might owe
7 | someone else money. These records are often created in code.

8 |       20.    As noted above, drug dealers use cellular telephones as a tool or
9 | instrumentality in committing their criminal activity. They use them to maintain contact
10 | with their suppliers, distributors, and customers. They prefer cellular telephones because,
11 | first, they can be purchased without the location and personal information that land lines
12 | require. Second, they can be easily carried to permit the user maximum flexibility in
13 | meeting associates, avoiding police surveillance, and traveling to obtain or distribute
14 | drugs. Third, they can be passed between members of a drug conspiracy to allow
15 | substitution when one member leaves the area temporarily. Since cellular phone use
16 | became widespread, every drug dealer I have contacted has used one or more cellular
17 | telephones for his or her drug business. I also know that it is common for drug traffickers
18 | to retain in their possession phones that they previously used, but have discontinued
19 | actively using, for their drug trafficking business. Based on my training and experience,
20 | the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or
21 | crimes. This includes the following:

22 |       a.    The assigned number to the cellular telephone (known as the mobile
23 | directory number or MDN), and the identifying telephone serial number (Electronic
24 | Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile
25 | Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are
26 | important evidence because they reveal the service provider, allow us to obtain subscriber
27 | information, and uniquely identify the telephone. This information can be used to obtain
28 | toll records, to identify contacts by this telephone with other cellular telephones used by

AFFIDAVIT OF RICHARD HUNTINGTON- 10

1  co-conspirators, to identify other telephones used by the same subscriber or purchased as
2  part of a package, and to confirm if the telephone was contacted by a cooperating source
3  or was intercepted on a wiretap here or in another district.

4      b.      The stored list of recent received calls and sent calls is important
5  evidence.  It identifies telephones recently in contact with the telephone user.  This is
6  valuable information in a drug investigation because it will identify telephones used by
7  other members of the organization, such as suppliers, distributors and customers, and it
8  confirms the date and time of contacts.  If the user is under surveillance, it identifies what
9  number he called during or around the time of a drug transaction or surveilled meeting.
10  Even if a contact involves a telephone user not part of the conspiracy, the information is
11  helpful (and thus is evidence) because it leads to friends and associates of the user who
12  can identify the user, help locate the user, and provide information about the user.
13  Identifying a defendant's law-abiding friends is often just as useful as identifying his
14  drug-trafficking associates.

15      c.      Stored text messages are important evidence, similar to stored
16  numbers.  Agents can identify both drug associates, and friends of the user who likely
17  have helpful information about the user, his location, and his activities.

18      d.      Photographs on a cellular telephone are evidence because they help
19  identify the user, either through his or her own picture, or through pictures of friends,
20  family, and associates that can identify the user.  Pictures also identify associates likely to
21  be members of the drug trafficking organization.  Some drug dealers photograph groups
22  of associates, sometimes posing with weapons and showing identifiable gang signs.

23      e.      Stored address records are important evidence because they show the
24  user's close associates and family members, and they contain names and nicknames
25  connected to phone numbers that can be used to identify suspects.

26                          **CONCLUSION**
27
28

AFFIDAVIT OF RICHARD HUNTINGTON- 11

1        21.   For the foregoing reasons, I respectfully submit that there is probable cause

2    to search **2101 Southwest Sunset Boulevard, Building A, Apartment 308**, **Renton**,

3    **Washington**.

4

5

6

7

8                         _____

9                         Richard Huntington

                          Task Force Officer

10                        Drug Enforcement Administration

11

12

13   The above-named agent provided a sworn statement attesting to the truth of the contents

of the foregoing affidavit on the 12th day of March, 2018..

14

15

16                        _____

17                        THE HONORABLE BRIAN A. TSUCHIDA

                     United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF RICHARD HUNTINGTON- 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Attachment A

List of Locations to be Searched

Target Location:  2101 Southwest Sunset Boulevard, Building A, Apartment 308, Renton, Washington.  This is an apartment on the third floor.  The building is marked with the letter 'A''.  The apartment is located down an alcove with opposing doors on each side of the alcove.  As you enter the alcove, the apartment numbers are on the wall.  Facing the alcove, "308" is on the left of the alcove hallway.  "307" is on the right of the alcove hallway.  Apartment 308 is the door on the left as walking down the alcove towards to opposing doors

Attachment B

List of Items to be Searched for and Seized

This warrant authorizes the government to search for the following items:

The following evidence, instrumentalities, and/or fruits of the commission of the following crimes: *distribution and possession with intent to distribute controlled substances*, in violation of 21 U.S.C. § 841(a)(1); *conspiracy to distribute controlled substances*, in violation of 21 U.S.C. § 846:

1.      Controlled Substances:  Including but not limited to cocaine.

2.      Drug Paraphernalia:  Items used, or to be used, to store, process, package, use, and/or distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, tape, hockey or duffel bags, baggies or other packaging materials, chemicals or items used to test the purity and/or quality of controlled substances, and similar items.

3.      Drug Transaction Records:  Documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances, however stored.

4.      Customer and Supplier Information:  Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items.

5.      Weapons:  Including but not limited to firearms, magazines, ammunition, holsters and body armor.

6.      Cash and cash equivalents, to include negotiable instruments that can be purchased with cash, such as cashiers' checks, travelers checks, and money orders.

7.      Money counters, shrink wrap devices, and similar items related to the processing, packaging, and transportation and/or concealment of cash.

8.      Photographs/Surveillance:  Photographs, video tapes, digital cameras, surveillance cameras and associated hardware/storage devices, and similar items, depicting property occupants of the property occupants, their associates, and assets.

9.      Indicia of occupancy, residency, dominion and control, and/or ownership of property, including, but not limited to, utility and telephone bills, canceled envelopes,

rental / lease records or payment receipts, leases, mortgage statements, and other documents.

10.     Codes:  Evidence of codes used in the distribution of controlled substances, including but not limited to passwords, code books, cypher or decryption keys, and similar information.

11.     Evidence of Storage Unit Rental or Access:  rental and payment records, keys and codes, pamphlets, contracts, contact information, directions, passwords or other documents relating to storage units.

12.     Safes and locked storage containers, and the contents thereof which are otherwise described in this document.

13.     Evidence of asset ownership, to include registration information, ownership documents, purchase documents, or other evidence of ownership of assets, including, but not limited to vehicles, vessels, all-terrain vehicles, and other personal property.

14.     Documents evidencing domestic or international wire transfers.

15.     Documents reflecting the source, receipt, transfer, control, ownership, and disposition of United States and/or foreign currency.

16.     Correspondence, papers, records, and any other items showing employment or lack of employment.

17.     Travel documents: airline tickets, frequent flyer statements, boarding passes, travel itineraries, passports, and other documents related to travel.

18.     Evidence of association with co-conspirators, to include address books, photographs, and documents such as telephone records and bills establishing associations with others involved in the offenses listed above.

19.     Tools:  Tools that may be used to open hidden compartments in vehicles, paint, bonding agents, magnets, or other items that may be used to open/close said compartments.

20.     Cell Phones: Cellular telephones and other communications devices including smartphones (i.e., iPhones, Android phones, and the like) may be seized, and searched for the following items:
        a.      Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);
        b.      Stored list of recent received, sent, and missed calls;

        c.      Stored contact information;

        d.      Stored photographs of narcotics, currency, firearms or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs;

        e.      Stored photographs of narcotics, currency, firearms or other weapons, evidence of suspected criminal activity;

        f.      Stored text messages.